DISTRICT OF OREGON, ss:                    AFFIDAVIT OF GRANT TAYLOR

**Affidavit in Support of a Criminal Complaint and Arrest Warrant**

I, Grant Taylor, being duly sworn, do hereby depose and state as follows:

**<u>Introduction and Agent Background</u>**

1.      I am a Special Agent with the Federal Bureau of Investigation and have been employed with the FBI since June of 2021. Since becoming a Special Agent, I have received specialized training from the FBI, to include completing the 21-week New Agent Training course at the FBI Academy in Quantico, Virginia.  I am currently assigned to the Seattle Field Division at the Vancouver office where I am a member of the Columbia River Organized Crime Task Force.  In this capacity, I investigate, inter alia, organized crime, drug trafficking, firearms offenses, and related violations.  Based upon my training and experience, I am familiar with the methods criminals use to transport, market, and distribute illicit narcotics.  I am also familiar with the means of communication criminals employ in pursuit of these objectives, as well as their methods of collecting proceeds and laundering funds.  In my role as a Special Agent for the FBI, I have participated in many aspects of investigations, including conducting physical surveillance, managing confidential sources, interviewing witnesses, conducting controlled buys of illicit narcotics and firearms, and executing search warrants.  I am an investigative law enforcement officer of the United States within the meaning of Title 18, United States Code, Section 2510(7).  As such, I am empowered to conduct investigations of, and to make arrests for, violations enumerated in Title 18, United States Code, Section 2516.

2.      I submit this affidavit in support of a criminal complaint and arrest warrant for Reynalda HERRERA-Huerta, date of birth XX/XX/1980, for Conspiracy to Possess with Intent to Distribute Methamphetamine, a Schedule II controlled substance, in violation of 21 U.S.C. §§

**Page 1 – Affidavit of Grant Taylor**

841(a)(1), (b)(1)(A)(viii), and 846.  As set forth below, there is probable cause to believe, and I do believe HERRERA committed this offense.

3.    This affidavit is intended only to show that there is sufficient probable cause for the requested criminal complaint and arrest warrant and does not set forth all of my knowledge about this matter.  The facts set forth in this affidavit are based on my own personal knowledge, knowledge obtained from other individuals during my participation in this investigation, including other law enforcement officers, interviews of witnesses, a review of records related to this investigation, communications with others who have knowledge of the events and circumstances described herein, and information gained through my training and experience.

## Applicable Law

4.    Title 21, United States Code, Sections 841(a)(1) and 846 makes it illegal to conspire to manufacture, distribute, or possess with the intent to manufacture or distribute a controlled substance, including more than 500 grams of a mixture or substance containing a detectable amount of methamphetamine.

## Background of Investigation

5.    In the fall of 2025, investigators[1] received reporting from a Confidential Human Source (CHS-1). CHS-1 began cooperating with the government for potential sentencing consideration on state charges. CHS-1 has an extensive criminal history that includes multiple misdemeanor and felony convictions, including for: Burglary in 2007; Unlawful Imprisonment, Assault, Interference with Reporting Domestic Violence, Residential Burglary, and Resisting Arrest in 2013; Manufacture, Delivery, and Possession with Intent to Distribute Marijuana in

---

[1] When I use the term "investigators" throughout this affidavit, I am referring to law enforcement personnel, including but not limited to FBI special agents, task force officers, other law enforcement agents, and local law enforcement sergeants, detectives, officers, and deputies.

**Page 2 – Affidavit of Grant Taylor**

2016; and a Community Custody Violation in 2019. CHS-1 has provided accurate and verified information to law enforcement in the past.

6.      Investigators also received reporting from a second CHS (CHS-2). CHS-2 also has an extensive criminal history with numerous drug-related felonies. Additionally, CHS-2 has prior convictions for Burglary, Theft, and Criminal Mischief. CHS-2 began cooperating for potential sentencing consideration on state charges. CHS-2 has provided accurate information that has been verified by law enforcement. However, on November 12, 2025, I became aware of information that CHS-2 was recently involved in unauthorized and illegal drug trafficking activity.  Additionally, in March of 2026, I became aware that CHS-2 had died from an overdose. The information relied on herein from CHS-2 was obtained before I received this information regarding unauthorized drug trafficking.

7.      CHS-1 reported that JOSE Last Name Unknown (LNU) was using phone number XXX-XXX-6225 (Target Telephone 1, or TT-1) in order to coordinate deliveries of distributable amounts of drugs. JOSE was selling methamphetamine for $1,250 per pound and fentanyl powder for $800 per ounce. These prices would drop if the order was for over ten pounds of methamphetamine or over five ounces of fentanyl powder. JOSE had runners near the Eugene, Oregon, area who would make deliveries in Albany, Salem, and Portland.

8.      Investigators discovered that TT-1 was a number that was a Voice Over Internet Protocol (VOIP) line serviced by TextNow Inc. On October 3, 2025, investigators served TextNow with an administrative subpoena for TT-1. IP logs showed that TT-1 had been using IP addresses that return to locations in Mexico.

9.      Based on my training and experience, I know that Mexican drug trafficking organizations often consist of narcotics dispatchers who reside in Mexico to escape law

**Page 3 – Affidavit of Grant Taylor**

enforcement pressure. I know that these dispatchers typically set up cells in the United States to distribute narcotics to their customers and collect money on their behalf. These cells often consist of several runners, a logistics coordinator for necessities such as cars and residences, and a local boss to oversee the operation. I also know that dispatchers use separate lines of communication for their subordinates and for their customers. I believe TT-1 is the customer line for the organization. I also know that drug traffickers use VOIP services such as TextNow to be able to rapidly change numbers and limit the amount of information available at first glance to law enforcement.

### Controlled Purchase #1

10.    In October 2025, investigators conducted a controlled purchase of methamphetamine and fentanyl by coordinating with JOSE. Investigators met with CHS-1 at a staging location and searched CHS-1's person and vehicle. No contraband was found. Investigators then provided CHS-1 with a quantity of US currency for the purchase of methamphetamine and fentanyl powder as well as an audio/video recorder which also provided live monitoring. CHS-1 texted TT-1 and was directed to drive to a location. CHS-1 drove to the location provided by JOSE while investigators maintained physical surveillance. CHS-1 parked next to a black BMW sedan with no license plate and entered the BMW.

11.    The BMW was occupied by a male and a female. On the recording, the voices could be heard discussing prices for "crystal" and "fetty" with CHS-1. Based on my training and experience, I know that "crystal" is the street name for methamphetamine and "fetty" is the street name for fentanyl. The female stated the price for both, and then the male made a phone call in Spanish. CHS-1 reported that the phone call was made via WhatsApp. In the phone call, the male said that he was making the delivery and asked for confirmation of prices. Based on my training and experience, I know that dispatchers determine the prices they give their customers. I believe

**Page 4 – Affidavit of Grant Taylor**

the male runner called JOSE to receive direction on what the final price was for CHS-1. Once the prices were confirmed by the individual on the other end of the phone call, CHS-1 made the purchase of the methamphetamine and the fentanyl and returned to CHS-1's vehicle. CHS-1 later reported that when the runners retrieved the methamphetamine, they accessed the trunk where multiple other gallon sized bags of methamphetamine were visible. Investigators attempted to follow CHS-1 away from the buy location but were separated for a period of approximately 8 minutes. The live monitoring/recording device was on for the entirety of this time and no unusual activity or meetings with other individuals were detected.

12.    Investigators regained surveillance on CHS-1 and followed CHS-1 to the staging location. Investigators retrieved a gallon sized bag of what appeared to be methamphetamine and a small, sealed baggie of what appeared to be fentanyl powder. The suspected drugs were transported back to the Clark County Sheriff's Office (CCSO) Special Investigations Unit (SIU) where they were weighed and stored overnight. Investigators transported the drugs to the Vancouver Resident Agency of the FBI the following day. The suspected methamphetamine was weighed and field tested, returning a positive indication for methamphetamine. The total packaged weight of the methamphetamine was found to be 487.8 grams, and the total packaged weight of the suspected fentanyl powder was found to be 61.6 grams.

<h3 style="text-align:center">Identification of Jose's Runners</h3>

13.    CHS-2 provided information that JOSE's runners would be located at a hotel at a certain time. Investigators went to the hotel and set up surveillance. Investigators observed a black BMW with a temporary tag but no plates. Shortly thereafter, investigators observed a woman dressed in a pink hoodie retrieve items from the black BMW and walk to a silver Chevrolet Impala with Oregon temporary tag 1212973. The woman placed the items in the Impala and then made

**Page 5 – Affidavit of Grant Taylor**

several more trips between the two vehicles. A younger adult male joined the woman and made several trips between the BMW and the Chevrolet Impala.

14.    Investigators requested records for the Impala and received returns showing that the car was registered to Reynalda HERRERA Huerta, at an address in Springfield, Oregon. A driver's license picture for HERRERA matched the woman seen walking back and forth between the two vehicles. Investigators requested a list of vehicles registered to HERRERA. The list provided a 1997 Toyota Camry owned by both HERRERA and an individual named Carlos Javier CALVILLO. CALVILLO's driver's license picture also matched the adult male seen with HERRERA moving between the BMW and the Impala, and CALVILLO's address was also listed as the same address in Springfield, Oregon. Investigators showed CHS-1 pictures of HERRERA and CALVILLO. CHS-1 confirmed HERRERA and CALVILLO were the male and female that CHS-1 bought methamphetamine and fentanyl from during Controlled Buy #1. It was later determined that CALVILLO arrived in the United States after the date of Controlled Buy #1. CALVILLO has a younger brother who looks very similar to CALVILLO.

15.    Investigators searched public records for phone numbers associated with HERRERA and found phone number XXX-XXX-4088. Phone number XXX-XXX-4088 (TT-2), is a number serviced by T-Mobile, and was listed as a possible match for HERRERA's phone. Investigators served an administrative subpoena to T-Mobile for TT-2. The subscriber was listed as Reynalda HERRERA Huerta at the same Springfield, Oregon address. The number was listed as active since April 25, 2025.

### Controlled Purchase #2

16.    In early November, investigators conducted another controlled purchase from JOSE. Investigators again met with CHS-1 at a staging location prior to the buy. Investigators

**Page 6 – Affidavit of Grant Taylor**

searched CHS-1's person and vehicle and no contraband was found. Investigators then provided CHS-1 with a quantity of US currency for the purchase of narcotics as well as an audio/video recording device which also provided live monitoring. CHS-1 was given a meeting location by JOSE and drove there, followed by investigators. While en route, technical issues required investigators to restart the recording device. The device did not monitor a period of approximately ten minutes but restarted just before the CHS met with the runners. A gray BMW with no plates and what appeared to be a temporary tag in the rear window parked next to the CHS's vehicle. CHS-1 entered the BMW and met again with a male and female. CHS-1 reported they were the same two from Controlled Purchase #1, who investigators believed were HERRERA and CALVILLO.

17.    CHS-1 made the purchase and returned to the staging area, followed by investigators. Investigators retrieved what appeared to be methamphetamine in gallon bags and a small sealed black pouch. The suspected methamphetamine was weighed and field tested, returning a positive indication for methamphetamine.

### Geolocation Warrant for TT-2

18.    On November 5, 2025, a geolocation warrant for TT-2 was signed in the District of Oregon. This warrant was served to T-Mobile on November 6, 2025, and also included historical location data for TT-2. Investigators looking through the data observed that pings for the phone appeared to track down to California on October 30, 2025. They appeared to return to the Springfield area on October 31, 2025. Based on my training and experience, I know that the Los Angeles area is a hot spot for drug trafficking activity. I know that dealers in markets further from the border often make trips to the Los Angeles area in order to pick up narcotics and transport them back to their area of operations. These trips are often done via car and take place over a very short

**Page 7 – Affidavit of Grant Taylor**

period of time. Given that Controlled Purchase #2 was done shortly after this trip, I believe TT-2's trip to Los Angeles was done for the purpose of resupplying CALVILLO and HERRERA.

19.    Investigators monitoring geolocation pings for TT-2 observed the phone travel to Salem and Portland at night several times, consistent with known patterns of HERRERA and CALVILLO. On the morning of November 11, 2025, investigators saw that the phone was again traveling south along I-5. TT-2 had left Springfield, Oregon, at approximately 2:30 AM. The phone eventually stopped just outside of Los Angeles in Santa Monica, California, on the afternoon of November 11, 2025. The pings for TT-2 were in the area of FOUND Hotel Santa Monica.

**Investigators Identify Subject Vehicle**

20.    Investigators served an administrative subpoena to FOUND Hotel and found that CALVILLO had rented a room at the hotel. CALVILLO listed his phone number as XXX-XXX-4088 (TT-2) and his vehicle as a gray Chevrolet with California license plate 9THB442. Investigators ran the license plate and discovered that it was a rental car from Hertz Car Rental. This car was a 2025 Chevrolet. The license plate returns did not specify what model the vehicle is but did provide that it is a "Body Type Model (BTM) 4 High," meaning it is a four-wheel drive vehicle such as a pickup or other multipurpose vehicle.

21.    On the morning of November 12, 2025, investigators saw the pings for TT-2 heading east out of Los Angeles. The pings went to a rest stop outside of Palm Springs and stayed there for approximately two hours. TT-2 did not continue east from the rest stop. It appears that the rest stop was the intended destination. TT-2 then returned to the area of FOUND Hotel in Santa Monica. Based on my training and experience, I know that people do not often choose rest stops as final destinations for long trips. Such stops are often used for meetings or exchanges. I know

**Page 8 – Affidavit of Grant Taylor**

that drug dealers often conduct such meetings in remote areas to conduct exchanges of money or drugs.

22.    On the evening of November 12, 2025, investigators saw the pings for TT-2 head north.  Upon leaving the area of Los Angeles, the pings tracked along I-5, continuing at regular intervals throughout the night. Investigators drove to the Medford, Oregon, area and set up surveillance along I-5.

### November 13, 2025, Seizure of Methamphetamine and Fentanyl

23.    On November 13, 2025, investigators obtained an anticipatory federal search warrant for the Subject Vehicle and CALVILLO's person.  These warrants were to be executed when CALVILLO and his rental vehicle (the Subject Vehicle) reentered the District of Oregon. The warrants were signed by the Honorable United States Magistrate Judge Youlee Yim You.

24.    Investigators observed the pings enter an area of Medford, Oregon and they began driving among the cars on I-5. Investigators located the Subject Vehicle, which was found to be a gray Chevrolet Trax SUV bearing California license plate XXXXXXX. Investigators followed the Subject Vehicle to a rest stop, where they observed two males, a female, and a child exit the car. The occupants reentered the Subject Vehicle and continued north followed by investigators.

25.    At approximately 11:10 AM near Roseburg, Douglas County, Oregon, an Oregon State Patrol (OSP) trooper initiated a traffic stop on the Subject Vehicle for speeding. The trooper identified the driver as CALVILLO. The trooper received consent from CALVILLO to search the Subject Vehicle, and CALVILLO signed a consent form. Investigators then asked the occupants of the Subject Vehicle to step outside the car while the car was searched.

26.    In the trunk of the Subject Vehicle, investigators found a large black duffel bag filled with 24 large saran-wrapped bundles with what appeared to be blue laundry detergent inside.

 **Page 9 – Affidavit of Grant Taylor**

Each appeared to be about the size and weight of a kilogram of methamphetamine. Based on my training and experience, I know that this is a common packaging technique for methamphetamine. The laundry detergent is used to help hide the odor of drugs from drug-sniffing dogs.

27.     Investigators also found a large laundry bag full of four sealed and wrapped brick sized objects with different color wrapping and writing on the outside. Based on my training and experience, I know that fentanyl powder is often packaged like this, with the colors and writing denoting different sources and mixtures of the drug. Based on the previous controlled purchases from CALVILLO of methamphetamine and suspected fentanyl, I believe this is what he was transporting back to his area of operation.

28.     During the traffic stop, HERRERA arrived at the location alongside the I-5 Freeway and inquired about the stop and her son, CALVILLO.

29.     Investigators transported the seized evidence items back to the Clark County Sheriff's Office (CCSO) Special Investigations Unit (SIU) office. There the suspected methamphetamine was field tested with a TruNarc machine. The field test returned a positive indication for methamphetamine. Based on previous issues with TruNarc detecting fentanyl, the suspected fentanyl was not field tested. The methamphetamine was weighed and found to have a total weight of approximately 25,013 grams before being packaged and sealed as evidence. The suspected fentanyl was weighed and found to have a total weight of approximately 4,579 grams before being packaged and sealed as evidence. I know from my training and experience that approximately 25,013 grams is a distribution quantity of methamphetamine.

**Page 10 – Affidavit of Grant Taylor**

30.    A photo of the narcotics seized from the Subject Vehicle can be found below:



31.    CALVILLO's cellphone was seized from the Subject Vehicle. CALVILLO was placed under arrest and read his *Miranda* rights. He did not provide an interview to law enforcement. The remaining occupants of the Subject Vehicle were released.

### Review of CALVILLO's phone

32.    After the traffic stop and arrest of CALVILLO, investigators reviewed CALVILLO's phone pursuant to the anticipatory federal search warrant for the Subject Vehicle and CALVILLO's person. The phone was reviewed and translated by an investigator who was tested by the FBI and received a score deemed competent for translations. CALVILLO had an app called Threema which was used to communicate with an individual listed as "Hugo Boss." Based

**Page 11 – Affidavit of Grant Taylor**

on my training and experience, I know that Threema is an encrypted communications application based in Switzerland. I know that criminals often employ encrypted messaging applications to avoid discovery by law enforcement. In the chats with "Hugo Boss," CALVILLO, using the screen name "Black," says the following on October 29, 2025[2]:

Black: Hey I downloaded the application. I'm the water lady's son.

Black: Call me when you can.

33.    Based on my training and experience, I know that the term "water" is the street name for methamphetamine. CALVILLO is HERRERA's son. Therefore, I believe that CALVILLO is identifying his mother, HERRERA, as a supplier of methamphetamine who is known to "Hugo Boss."

34.    Also found on the phone were WhatsApp messages with an individual listed as "Mom." The phone number for this individual was XXX-XXX-7207. Investigators issued an administrative subpoena to T-Mobile for this number and found it to be registered to Reynalda HERRERA-Huerta at the same previously identified address in Springfield, Oregon. CALVILLO's screen name was "JavisszZ." In one set of messages, "Mom" sent two pictures of a black BMW sedan with no plates. The BMW does not appear to have plates. Of note, a black BMW sedan with no plates was used by the couriers during the first controlled buy. Below are the responses:

JavisszZ: It's cool I like it

Mom: Well when you arrive you'll help me

---

[2] The time on the messages lists it as around 2:07 AM UTC on October 30, 2026, meaning the chat would have taken place on October 29, 2026 PST.

**Page 12 – Affidavit of Grant Taylor**

35.    In later messages, "Mom" sent a picture of a large pile of United States Currency laid out on a bed. Below are the responses:

Mom: Look at my work

Mom: (Emoji)

Mom: I have to count all that

JavisszZ: No kidding that's a ton but quick with the machine

36.    Further messages on WhatsApp between "JavisszZ" and "Mom" on November 9, 2025, appear to show "Mom" forwarding instructions for CALVILLO related to drug trafficking. The messages are below:

Mom: (forwarded message) Thanks see if the bigger (or older) one can bring down the paper and bring up some 3 bricks this time please. Because the water would be for next week probably.

JavisszZ: For when

Mom: Let me see what he says I think for tomorrow

37.    Based on my training and experience, I know that water is the street name for methamphetamine. I also know that "bricks" are typically references to cocaine or fentanyl powder. I believe this message from "Mom" is HERRERA passing along instructions for CALVILLO to bring bulk currency and exchange it for narcotics.

## Conclusion

38.    Based on the foregoing, I have probable cause to believe, and I do believe, that HERRERA has committed: Conspiracy to Possess with Intent to Distribute Methamphetamine, a Schedule II controlled substance, in violation of 21 U.S.C. §§ 841(a)(1) and 846. I therefore request that the Court issue a criminal complaint and arrest warrant for HERRERA.

**Page 13 – Affidavit of Grant Taylor**

39.     Prior to being submitted to the Court, this affidavit, the accompanying complaint, and the arrest warrant were all reviewed by Assistant United States Attorney Steve Chamberlin. AUSA Chamberlin advised me that in his opinion the affidavit and complaint are legally and factually sufficient to establish probable cause to support the issuance of the requested criminal complaint and arrest warrant.

*By phone pursuant to Fed R. Crim. P. 4.1*
GRANT TAYLOR
Special Agent
Federal Bureau of Investigations

Sworn by telephone at 2:30 pm a.m./p.m. on July 17 , 2026, in accordance with the requirements of Fed. R. Crim. P. 4.1.

_____
HONORABLE YOULEE Y. YOU
United States Magistrate Judge

**Page 14 – Affidavit of Grant Taylor**